Jack N. ENTIS, d/b/a Entis Associates, and Jack N. Entis, individually, Plaintiff-Appellant,

v.

ATLANTIC WIRE & CABLE CORPORA-TION, Defendant-Appellee.

No. 364, Docket 28194.

United States Court of Appeals Second Circuit.

Argued March 17, 1964.

Decided June 29, 1964.

Hays, Circuit Judge, dissented.

Benjamin Goldman, Boston, Mass., Di-Costanzo, Klonsky & Sergi, Brooklyn, N. Y., Robert Klonsky, Brooklyn, N. Y., for plaintiff-appellant.

Lawrence Greenapple, New York City, (Glass & Greenapple, New York City, Harold Greenberg, New York City, of counsel), for defendant-appellee.

Before FRIENDLY, HAYS and MARSHALL, Circuit Judges.

FRIENDLY, Circuit Judge.

Jack Entis, a resident of Massachusetts, brought this action in November, 1959, in the Eastern District of New York to recover commissions on sales made through October, 1959, allegedly due him as sales representative for Atlantic Wire & Cable Corp., a New York corporation having its principal place of business on Long Island, pursuant to an agreement which provided that Entis was to get "a commission of 5% on all orders which we receive and accept from customers whom you have solicited and on all reorders from the same customers at any time in the future, even though

you do not write the order."[1] Atlantic defended on the ground that it justifiably terminated Entis' employment on June 24, 1958, and thereby ended his right to commissions. The case was heard without a jury by Judge Bartels, who in an oral opinion, ruled that the contract required Entis to solicit customers; that his right to commissions did not outlive the period of his agency; that after a reasonable duration, which the judge found to have expired by June 24, 1958, the agency was terminable at will, on reasonable notice of thirty days; and that such notice was required since the discharge was not for just cause. Entis appeals from the refusal to award commissions on orders received after July 24, 1958, Atlantic from the award of damages for failure to give notice and on certain matters of computation. We affirm.

Prior to his association with Atlantic, Entis had become experienced in the manufacture and sale of electrical wire. During the first part of 1956 he had been a representative engaged in selling "unapproved ST and SJT wire" (wire not insulated so as to satisfy building codes), for a manufacturer which became insolvent. In July, 1956, by oral agreement, he was hired as Atlantic's exclusive New England representative for the sale of wire products, primarily lamp coil and building wire, but not ST and SJT wire which Atlantic was not then manufacturing. Two months later, Entis sought the protection of a written contract and enclosed a suggested form. This proposed agreement was identical with the later written contract insofar as it contained a clause guaranteeing Entis his 5% commission on all reorders from his customers "at any time in the future, even though you [Entis] don't write the order." He described this provision as "simply cover[ing] the relationship between a manufacturer and his agent."

In March, 1957, Entis convinced Rosenberg and Friedman, the managers of Atlantic, that there was money to be made in the sale of unapproved ST and SJT wire. He had some orders for his former employer which that company could not fill. The parties therefore terminated the New England sales arrangement and entered into the written agreement set out in footnote 1, supra, whereby Entis became Atlantic's exclusive representative for the sale of ST and SJT wire, without territorial limitation.

Entis sold wire under this agreement without incident until June 6, 1958, when, on making an unusually large shipment to one of his customers, M.

1. The entire agreement is as follows:
" ATLANTIC WIRE and CABLE CORPORATION
119–14 14th Road
College Point, New York
Flushing 3–4242
March 18th, 1957.
Mr. Jack N. Entis,
Entis Associates,
11 Babcock St.
Brookline 46, Mass.
Dear Mr. Entis:
Reference to your acting as our representative:
(1). Any trouble Lite Manufacturer who uses unapproved type ST or SJT as raw material will be served exclusively by Jack Entis.
(2). Jack Entis must be in agreement with price to be billed as a condition of acceptance of order by us.
(3). We agree to pay you a commission of 5% on all orders which we receive and accept from customers whom you have solicited and on all reorders from the same customers at any time in the future, even though you do not write the order. Commission to be paid on or about the 15th of the following month.
(4). We agree to send you all duplicate invoices and memos on all such orders.
(5). We agree to keep accurate accounts, books and records and make reports to you at the end of the month. Records of individual accounts assigned and solicited by Jack Entis are subject to inspection if necessary.
ATLANTIC WIRE & CABLE CORP.
By E. E. Rosenberg
ACCEPTED BY:
Jack N. Entis     "

Black Mfg. Co., Atlantic forwarded to him the duplicate invoice bearing a penned notation "commission of 2½%." In the blank marked "Salesman," the invoice had originally been typed to designate Black as a house account, but these code letters were crossed out by hand, with "Entis" written in their place. On the duplicate invoice retained by Atlantic, a penned notation broke the shipment down into its larger component, SJT wire, next to which amount was written 2½%, and its smaller part, ST, which was marked 5%. On June 16, a subsequent shipment completing the same order was again credited to the house, but as in the case of the June 6 shipment, the duplicate invoice was amended by hand-noted credit to Entis with commission at 2½%. Entis soon wrote complaining, "You agreed that my commission would be 5%. At no time did I ever agree to reduce it and you know that you can't reduce it." An argument ensued, with threats and accusations on both sides, whereupon Rosenberg informed Entis that his employment was terminated and mailed him a letter to that effect on June 24, 1958.

Shortly before the discharge, Atlantic had received two large orders from Entis' best account, Woods Wire Products; it filled these over a number of months without paying commissions. Atlantic continued to accept orders from Woods Wire and other Entis customers after the termination; all were credited to the house on the shipping invoices, and no commissions were paid. Entis sought to show that his discharge was attributable to his success rather than his failure as a salesman, and that Atlantic had become eager to reduce or, if that was not possible, to avoid ever increasing commissions. The judge's finding that Atlantic discharged Entis without cause or good faith was amply supported, but, in view of his construction of the contract, its significance was limited to requiring a notice period. The court credited Entis with commissions on all orders received before discharge (regardless of delay in shipment) and on all orders received in the next thirty days (again regardless of delay in shipment), and also, for those thirty days, in order to compensate for commissions lost because of inability to solicit for Atlantic, with the average of his monthly commissions over the past year. From this total, it deducted an amount previously collected under a *quasi in rem* judgment in Massachusetts.

Entis seeks to support his claim that the contract entitled him to commissions on all future orders from his customers by a group of New York cases which construed contracts, generally oral, as entitling the agent to receive commissions so long as the principal did business with the agent's customers, regardless of discontinuance of the agency relationship. See, e. g., Martocci v. Greater N. Y. Brewery, Inc., 301 N.Y. 57, 92 N.E.2d 887 (1950); Zupan v. Blumberg, 2 N.Y.2d 547, 161 N.Y.S.2d 428, 141 N.E. 2d 819 (1957); Cohen v. Bartgis Bros. Co., 264 App.Div. 260, 35 N.Y.S.2d 206 (1942), aff'd 289 N.Y. 846, 47 N.E.2d 443 (1943); Elsfelder v. Cournand, 270 App.Div. 162, 59 N.Y.S.2d 34 (1945); Nurnberg v. Dwork, 12 A.D.2d 612, 208 N.Y.S.2d 799 (1960), aff'd 12 N.Y.2d 776, 234 N.Y.S.2d 721, 186 N.E.2d 568 (1962); Archer v. Hamilton Wright Org., 155 N.Y.S.2d 556 (Sup.Ct.1956); Stone v. Ransel Trading Corp., 16 Misc. 2d 758, 185 N.Y.S.2d 11, 13 (Sup.Ct. 1959). Atlantic responds with an equally impressive list of New York decisions that employment and commission contracts of indefinite duration are terminable at will. E. g., Martin v. New York Life Ins. Co., 148 N.Y. 117, 42 N.E. 416 (1895); Watson v. Gugino, 204 N.Y. 535, 98 N.E. 18, 39 L.R.A.,N.S., 1090 (1912); Arentz v. Morse Dry Dock Co., 249 N.Y. 439, 164 N.E. 342, 62 A.L.R. 231 (1928); Rubin v. Dairymen's League, 284 N.Y. 32, 29 N.E.2d 458 (1940); Scott v. Engineering News Pub. Co., 47 App.Div. 558, 62 N.Y.S. 609 (1900); Winslow v. Mayo, 123 App. Div. 758, 108 N.Y.S. 640 (1908), aff'd 195 N.Y. 551, 88 N.E. 1135 (1909);

Greenwich Village Beverages, Inc. v. Food Merchandisers, Inc., 8 A.D.2d 719, 186 N.Y.S.2d 96 (1959). The conflict is more apparent than real. As Corbin points out, such contracts "are usually very informal, with brevity in wording and much uncertainty in meaning * *." The facts surrounding the agreement will often make it clear that one party's interpretation of the "elliptical expressions" is the reasonable one and that it is "unreasonable for the other party not to know" this. 3A Contracts § 684 (1960 ed.). Courts have shown understandable reluctance to construe a contract as binding the principal for the agent's life or even beyond, as Entis claims. See 1 Corbin, supra, § 96 (1963 ed.). This unwillingness is apparent in the New York cases cited by Atlantic, especially Scott v. Engineering News Pub. Co., supra.

The cases relied on by Entis are distinguishable in several respects. With but one or two exceptions, they involved not the employment of a sales representative but rather an offer by a business to pay commissions to an independent agent if he succeeded in bringing into the business's clientele a potentially large customer over whom the agent had some influence. In such cases it is generally not anticipated that the independent agent will continue to solicit the customer after bringing him in or render any other services; from that point on, the success of future relationship with the customer rests solely with the principal. Since it would be quite unreasonable to limit the agent to commissions on the initial order, the offer can well be construed, in the absence of any other sensible stopping point, as promising the agent commissions on all business resulting from the initial contact. Zupan v. Blumberg, supra; Nurnberg v. Dwork, supra. Remuneration of this kind resembles a "finder's fee" or a life insurance agent's commissions on annual premiums, rather than commissions paid to a salesman who solicits customers for orders, attends to their complaints, and because of his continued relations has

a chance to divert them if his agency is terminated. Secondly, nearly all these cases were decided on motions to dismiss complaints on the ground that the oral contracts alleged therein came within the "not to be performed within one year" clause of the Statute of Frauds, N.Y. Personal Property Law, § 31, subd. 1, since the agent's rights would continue in existence so long as it remained possible that the third party might place orders with the offeror. For the purpose of such a motion, the offeror had no reason to, and did not oppose the agent's claim that the contract entitled him to commissions after the termination of the relationship.

Entis sought to assimilate his case to the "finder's fee" variety by testimony that when he entered into the contract, he was "sitting on thousands of feet of orders" intended for his bankrupt former employer, that he told this to Rosenberg and Friedman, and that he showed them how to manufacture SJT wire so that it would be satisfactory to his customers. But the judge evidently did not credit this in view of the lack of independent corroborative testimony or documentary proof. Entis did show that Woods Wire had placed an order amounting to about $12,000 shortly after he had entered into the contract. But such an order alone was not so large as to support the exceptional construction that Entis urged. Furthermore there was evidence that some of Entis' customers had been clients of Atlantic before Entis entered into its service, as well as testimony by Rosenberg and Friedman that Entis had secured customers through "leads" they had furnished.

The implied obligations Entis assumed under the agreement, to serve and solicit his customers and not to compete with Atlantic, do not require the conclusion that Atlantic promised not to terminate his employment without cause. The fairness of Entis' bargain was assured by Atlantic's unconditional promise to give him exclusivity, or not to compete with him, during his tenure. The existence of such limited

mutually binding duties would not negate terminability. See 1 Corbin, supra, § 21(7); also ALI, Restatement 2d, Agency § 442 (1958). To the contrary, construction of the agreement as imposing obligations on Entis, which we agree to be reasonable in view of Atlantic's above mentioned promise and its further promises to keep accounts and make reports for his benefit, further differentiates this case from the "finder's" type where the agent substantially finishes his job when he brings the customer to the principal. The clause entitling Entis to commissions on "all reorders * * * at any time in the future, even though you do not write the order" served an important function even though limited to the duration of Entis' employment; it protected him against the eventualities that his customers might at times place their orders directly or transmit them through some other representative.

■■ Although we thus approve the judge's conclusion that Entis was not entitled to commissions on orders received after termination of his employment, we still must determine to what minimum duration Atlantic had committed itself. New York precedents do not conclude the question. In Town & Country House & Home Service v. Newbery, 3 N.Y.2d 554, 170 N.Y.S.2d 328, 147 N.E.2d 724 (1958), the Court of Appeals held that a group of employees quitting the service of their employer were not obliged to give notice. Although the language used was broad enough to cover also the discharge of an employee, the great text writers on contracts have noted that to permit termination of an agency at will at any time may be unduly harsh where the agent has invested money or effort in building up the principal's business, and that courts have often avoided unfairness by interpreting the agreement as calling for a reasonable duration, reasonable notice of termination, or both, see 1 and 3A Corbin, supra, §§ 1 and 684; 1 Williston, Contracts, § 39 (1957 ed.), 4 Williston, § 1027A (1936 ed.); Note, 42 Colum.L.Rev. 107, 122 (1942). The pres-

ent case is also distinguishable in that proof was submitted showing that notice was customarily given under such contracts in the trade. Corbin suggests, § 684, unexpectedly but, as usual, persuasively, that reasonableness should be judged as of the time of termination, rather than by what would have seemed reasonable at the time of contracting; if the implied promise of the parties is to be reasonable with one another as to termination, this promise may well be violated by subsequent insistence on terms which might have seemed reasonable at the moment of contracting but have become unfair as the relationship developed. Cf. Freeport Sulphur Co. v. Aetna Life Ins. Co., 206 F.2d 5, 41 A.L. R.2d 762 (5 Cir.1953). We see no reason to quarrel with the judge's determinations that a period of fifteen months was not an unreasonably short duration and that a period of thirty days gave sufficient notice. Entis had made no investment, and after dismissal he became free to compete and to win back his customers for another employer. The orders which he did produce and which Atlantic continued to receive after the termination did not seem so unusually large as to demand greater protection. Neither, turning to the cross-appeal, do we see any justification for less than a thirty-day notice.

■ In calculating damages, the judge was of course right in allowing commissions on all orders received before June 24 and during the thirty days thereafter regardless of Atlantic's delay in filling them. We likewise find nothing wrong in the additional allowance made to compensate Entis for the business lost during July because termination without the required notice deprived him of the ability to make further solicitations. Such an estimate necessarily requires some improvisation, and the party who has caused the loss may not insist on theoretical perfection. Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 379, 47 S.Ct. 400, 71 L.Ed. 684 (1927); Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S.

555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931); Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946).

Affirmed. No costs on appeal.

HAYS, Circuit Judge (dissenting).

I dissent from that part of the decision of the court which affirms the granting of damages for a period of one month after the employer terminated the contract.

In Town & Country House & Home Service, Inc. v. Newbery, 3 N.Y.2d 554, 170 N.Y.S.2d 328, 147 N.E.2d 724 (1958), the court held that an employment at will "legally required no notice [of termination] to be given, and rendered the employment terminable at any time at the option of either party."

I believe that we are required to follow the law of New York as it is, however sympathetic we may be to the "general" law as the great text writers would like it to be.