**In re HUDSON FEATHER & DOWN PRODUCTS, INC., Bankrupt.**

**HUDSON FEATHER & DOWN PRODUCTS, INC., Plaintiff,**

v.

**B&B ASSOCIATES, INC., Defendant.**

**Bankruptcy No. 78 B 2744 (CHG).**
**Adv. No. 78 B 2744 (CHG).**

United States Bankruptcy Court,
E. D. New York.

July 28, 1982.

Finkel, Goldstein & Berzow, New York City, for bankrupt; Harold S. Berzow, New York City, of counsel.

Chester B. Salomon, New York City, trustee in bankruptcy; David M. Green, New York City, of counsel.

## OPINION

CECELIA H. GOETZ, Bankruptcy Judge:

In this Chapter XI proceeding filed under the Bankruptcy Act of 1898 (former 11 U.S.C. § 701, *et seq.*), B&B Associates, Inc. ("B&B") has filed an administration claim for $10,499.50, allegedly due it for commissions on sales procured under a sales agency agreement. The debtor herein, Hudson Feather & Down Products, Inc. ("Hudson"), has brought on by motion a two-pronged "Application" which (1) objects to the amount of the claim and seeks its reduction to $2,435.15, and (2) asserts a "counterclaim" in the amount of $16,000 based on preferential payments allegedly received by B&B within four months of Hudson's petition for relief under the bankruptcy laws. At the trial on Hudson's motion, Hudson conceded that it was not seeking any affirmative recovery with respect to the alleged preference, recognizing itself to be barred by the two-year statute of limitations imposed by § 11e (former 11 U.S.C. § 29(e)), but was invoking § 57g (former 11 U.S.C. § 93(g)) of the Bankruptcy Act to bar allowance of B&B's claim.

All the issues were tried on May 13, 1982, the Court reserving for decision whether a preference, if established, would reduce the amount allowable on B&B's administration claim.

## FINDINGS OF FACT

1. On November 8, 1978, Hudson, which is in the business of selling feathers and down, filed for relief under Chapter XI and thereafter continued in business as a debtor-in-possession. Under its plan of arrangement, its creditors will receive approximately 7 percent of the face amount of their claims.

2. From at least as early as September, 1978 until Hudson filed for relief, it was insolvent in that its liabilities exceeded its assets. During this period of time, its condition steadily deteriorated.

3. Hudson's fiscal year ends September 30th. At the close of its 1978 fiscal year, its balance sheet showed a deficit of $3,770,000; at the close of its 1977 fiscal year, although its balance sheet showed a small surplus, this was due to the failure to write off as worthless an asset with a book value of $1,087,000. Hudson's financial situation continued unchanged from the close of its 1978 fiscal year until it filed for relief under Chapter XI.

4. When Hudson filed its petition for relief, its Chief Executive Officer was Morris Schachne, and one of its principal creditors was Arthur Puro and a corporation which he owns, Windsor Trading Corp. During the course of the Chapter XI proceeding, Puro assumed joint control with Schachne sometime in early 1979, and thereafter became Hudson's president, replacing Schachne as Chief Executive Officer.

5. B&B, which is now itself in bankruptcy, was engaged in business in the Orient and began soliciting orders on behalf of Hudson sometime in 1977, and in June, 1978, the then President of Hudson, James England, wrote the following letter to B&B in Korea:

"Dear Mr. Shin:

"I take personal pleasure in informing you that we have, effective immediately, appointed you *exclusive* sales agent for sales by Hudson Feather & Down Products, Inc. to all of its customer [*sic*] in the Republic of Korea.

"This decision has been made due to your superior performance representing Hudson over the past several months.

"I feel certain our confidence will grow in the future as our market position grows." (Emphasis in original.)

6. B&B employed a subagent in Taiwan, Taiwan-Scott Co., Ltd., to which it paid a commission of one percent on orders secured by Hudson from that country. Among the customers in Korea who placed orders with Hudson through B&B were "Shu Kwang Ind. Co., Ltd." and "Dharma."

7. Under B&B's arrangement with Hudson, it received a 2 percent commission on all sales it produced. Their method of operation was that B&B would secure an order from a customer, then it would "telex back to New York, through our [New York] office, to have them contact Hudson and request that they send an offer, directly into the customer." If the customer agreed to the offer, it would open up a letter of credit to the benefit of Hudson. When Hudson received payment under the letter of credit, it would send a copy of the bill of lading to B&B, and B&B would then bill Hudson for the commissions due it. B&B earned about $40,000 a year in commissions from Hudson based on around a dozen sales a year. According to Donald Beebe, B&B's President, Hudson customarily paid B&B within 30 days of receiving its bill.

8. From July, 1978 until Hudson filed for relief under the bankruptcy laws, Donald Beebe was in almost daily communication with Schachne and was aware that at least by August, 1978, Hudson was having a serious problem in meeting its obligations, had a "cash flow" problem and was being pressed for money by Puro, to whom Hudson was heavily indebted.

9. Around July, 1978 or earlier, Hudson began factoring its accounts receivable, *i.e.*, borrowing money against them, from Walter E. Heller & Co.

10. Between July 14, 1978 and November 2, 1978, Hudson issued the following checks to B&B in payment of past-due commissions:

| Bank | Number | Amount | Date |
| --- | --- | --- | --- |
| Chemical | 12472 | $ 5,000 | 7/14/78 |
| Chemical | 12831 | 1,000 | 7/21/78 |
| Chemical | 12832 | 1,000 | 7/25/78 |
| Chemical | 12833 | 1,000 | 7/26/78 |
| Chemical | 12834 | 1,000 | 7/27/78 |
| Chemical | 12835 | 1,000 | 7/28/78 |
| Chemical | 13096 | 1,000 | 9/06/78 |
| Chemical | 13235 | 500 | 10/12/78 |
| Chemical | 13236 | 500 | 10/16/78 |
| Chemical | 13237 | 500 | 10/18/78 |
| Chemical | 13238 | 500 | 10/20/78 |
| First Jersey | 1117 | 500 | 10/31/78 |
| First Jersey | 1118 | 500 | 11/02/78 |
| Chemical | 12814 | 1,000 | 7/27/78 |
| Chemical | 12815 | 1,000 | 7/28/78 (DX–B) |

11. Many of these checks were issued together, and several were postdated. No invoices supporting these payments were produced.

12. In a conversation with Arthur Puro sometime in September or October, 1978, Donald Beebe described Hudson as in "bad shape," said that it would be going out of business, that it could not pay its bills, and that it was giving him postdated checks. He suggested entering into a business arrangement with Puro, selling down to Korea and Taiwan.

13. The monies paid B&B totaling $16,000, all received in payment of an antecedent indebtedness, exceeded what B&B would have received on these obligations in the Chapter XI proceeding. At least $3,000 of this money was received at a time when B&B's President had reasonable cause to believe Hudson to be insolvent.

14. After Hudson filed under Chapter XI, B&B continued to solicit business on its account, reassuring customers that all would be well. However, at the request of one customer, two orders intended for Hudson were filled by Featherworks Corp., a subsidiary of Hudson.

15. On January 10, 1979, Hudson sent B&B a check for $1,000 on account of commissions then due it. At the same time, Schachne told Donald Beebe that Puro, who had just begun running Hudson jointly with Schachne, did not want to continue paying commissions to B&B, and that his agency was in jeopardy.

16. On March 2, 1979, Hudson billed B&B for $38.50 to cover the cost of a down vest sent B&B as a sample.

17. On March 7, 1979, B&B billed Hudson $4,927.50 for commissions due it ("First Invoice").

18. Following receipt of this invoice, Hudson sent a document entitled "ANNOUNCEMENT" to all its customers in Korea, about ten in number, and to B&B's subagent in Taiwan, Taiwan-Scott, Ltd., signed "The Management." The announcement read, in part: "As of March 9, 1979, Beebe Associates will no longer represent HUDSON FEATHER & DOWN PRODUCTS, INC. and FEATHERWORKS CORPORATION in the Far East." The announcement asked that orders be sent directly to Hudson or Featherworks, and concluded: "We look forward to a continuous good business relationship with you and shall handle your orders expeditiously." (Debtor's Ex. C.) Copies of this document were sent B&B's office in Korea and in New York. The copy sent Korea was returned marked "Moved, Left No Address." The copy sent New York was not returned.

19. Although Donald Beebe disclaims knowledge of this announcement, the Court does not credit his denial.

20. In March or April, 1979, Puro traveled to Korea, Hong Kong, and Taiwan to sell down for Hudson. While there, he called on the customers who had previously purchased from Hudson. Among the customers Puro saw was Shu Kwang Ind. Co., Ltd. and Dharma. Dharma placed an order with him at that time for 20,000 pounds of 80/20 down.

21. After Puro learned from B&B's agent and subagent in Taiwan that he had not been paid his percentage on commissions claimed to be owing on two orders obtained for Hudson and incidental expenses, Hudson, without securing any authorization first from B&B, paid Taiwan-Scott Ltd., Inc. $1,354.03.

22. On May 7, 1979, Hudson sent B&B two checks: one drawn by itself to the order of B&B in the amount of $1,961.50; the other drawn by Featherworks in the amount of $472.65. The two checks totaled $2,434.15. This represented the amount Hudson calculated to be due B&B as commissions as shown on the First Invoice after deducting the $1,000 earlier paid B&B and the following debits:

| | | |
|---|---|---|
| Sample vest | $ | 38.50 |
| United Airlines bill | | 50.82 |
| Taiwan-Scott billing | | 1,354.03 |
| Shu Kwang Sample | | 50.00 |

23. The checks were not submitted for payment because each bore on the back an endorsement stating the check to be "the final payment for all services rendered" to Hudson and Featherworks, respectively.

24. On May 21, 1979, B&B sent Hudson a second invoice for $6,572 for additional commissions ("Second Invoice"). Hudson has never offered to pay any part of this Second Invoice.

25. On June 3, 1980, B&B filed an administration claim for $10,499.50 based on its invoices of March 7, 1979 and May 21, 1979. It is this claim which has given rise to the present proceeding.

26. Hudson does not deny that the sales shown on the First Invoice were made and the commissions claimed as due were earned. With respect to the First Invoice, what it claims is that set-offs exist: (1) the debits previously claimed, and (2) the preferences allegedly received by B&B. Hudson admits no part of the Second Invoice, and does not concede either that the sales were made, or that any commissions are due B&B thereon.

27. The Second Invoice shows five sales. With respect to two of the alleged sales, B&B was able to produce no evidence that either was made: the sale of 17,050 pounds of 90/10 down at $14.50 per pound, for a total price of $25,375, or the sale of 7,500 pounds of 60/40 down at $8.50 per pound, for a total price of $63,750.

28. With respect to two other sales shown on the Second Invoice, B&B has obtained copies of applications for letters of credit, the first step after an order has been placed. With respect to the third and last sale for 10,000 pounds of 80/20 down at a total price of $112,500 and 3,600 pounds of 50/50 down for a total price of $27,000, B&B has produced two letters of credit apparently opened at the request of Shu Kwang Ind. Co., Ltd., Seoul, by cables dated March 29, 1979 and April 13, 1979.

29. This leaves only one item on the Second Invoice, and that is the item describing a sale of 10,000 pounds of 80/20 down for a total price of $100,000. B&B has produced a telex dated November 21, 1979 sent from its Korea office to its New York office, reading, in part: "DRMA REQ 80/20 10,000 LB IMMD SHPT BY STALE [sic] B/L L/C OPENG M.12," which means that Dharma requests 80/20 10,000 pounds immediate shipment by stale bill of lading, L/C, opened by mid-12, i.e., December. The invoice claims a commission on the sale described as follows: "10,000 80/20 Dharma sty B/L L/C M12." Evidently, B&B has been unable to find anything about this sale, other than this internal telex.

30. Donald Beebe explained the lack of documentation for the sales on the Second Invoice as due to the fact that after B&B's services were terminated, Hudson no longer provided it with bills of lading, and Hudson produced no records when B&B subpoenaed all documents reflecting shipments of the goods described in the Second Invoice.

31. Donald Beebe claims that he was continuously engaged in soliciting business for Hudson during the months of January, February, and March, 1979, and that these orders were the subject of continuous discussions between this customer and B&B's offices in Korea and New York. There is no evidence, however, that these sales, if they were made, were due to orders placed with Hudson prior to March 9, 1979.

32. Donald Beebe did not appear to be a candid witness. He was evasive, and his testimony was not forthcoming. The amounts and the dates of the checks given

him by Hudson are inconsistent with his claim that Hudson paid his invoices promptly within 30 days of receipt. Nor is his claim believable that until he spoke to Morris Schachne in April, he was unaware of the fact that every one of his customers in Korea had received a circular announcing the termination of his services, since he also claims that he was in constant communication with these customers, discussing orders for Hudson.

## DISCUSSION

The first issue raised by the parties is whether B&B was the beneficiary of a preference which must be surrendered before its administrative claim can be allowed. A "preference" under the Act is a transfer of property "on account of an antecedent debt" made by a debtor "while insolvent and within four months before the filing" of the petition under the Act, the effect of which transfer will enable such creditor to obtain a greater percentage of his debt than another creditor of the same class. Section 60a(1) (former 11 U.S.C. § 96(a)(1)). However, a preference is voidable by the trustee in bankruptcy only if the creditor receiving it had "reasonable cause" to believe that the debtor was "insolvent" when the transfer was made. Section 60b (former 11 U.S.C. § 96(b)).

There can be no question on this record that all the monies paid B&B during the four months preceding Hudson's Chapter XI petition were preferences; the only issue in doubt is whether Donald Beebe had reasonable cause to believe Hudson to be insolvent. As the authoritative text, *Collier on Bankruptcy*, notes, knowledge of insolvency, or even actual belief, is unnecessary; all that is required is "reasonable cause to believe." 3 (Part 2) *Collier on Bankruptcy* ¶ 60.53, at 1057 (14th ed. 1978):

"A creditor has reasonable cause to believe that a debtor is insolvent when such a state of facts is brought to the creditor's notice, respecting the affairs and pecuniary condition of the debtor, as would lead a prudent business person to the conclusion that the debtor is insolvent. Of course, a creditor may not wilfully close his eyes that he might remain ignorant of his debtor's condition. On the contrary, where circumstances are such as would incite a man of ordinary prudence to make inquiry, the creditor is chargeable with notice of all facts which a reasonably diligent inquiry would have disclosed. In such case, an inquiry of the debtor alone is generally insufficient, where his answer, under the circumstances, could readily have been found to be untrue. As a matter of fact, it is the creditor's cause for belief and not the debtor's knowledge, or lack of it, that is important. And if the creditor fails to make an inquiry when he has a duty to do so, he will be charged with all the knowledge which he would have acquired had he conducted such an investigation." *Id.* at 1057–1066.1.

According to Beebe, he was in almost daily communication with Hudson's head, Morris Schachne, at a time when Hudson was over $3,000,000 in debt. Whereas Hudson previously had been paying Beebe his commissions within 30 days of receipt of B&B's invoice, it was now reduced to discharging its debt through postdated checks in the amount of $1,000. By October, 1978, the checks had shrunk to $500 apiece. B&B's attempts to represent these checks as normal payments for commissions due are belied both by their number and by their amount. As the two invoices in the record show, it was rare that the commission on a particular sale worked out to an exactly round number. It would be even more extraordinary if there were a series of sales of such character, all for the same small quantity, particularly in view of Beebe's testimony that he earned his $40,000 in commissions normally as a result of a dozen large sales. Beebe's vain efforts to explain these checks as the product of normal business practices simply underscores how far from ordinary they were.

That Donald Beebe was aware of Hudson's difficulties is borne out by his conversation with Puro sometime in September or October, 1979, during which he

himself pointed to the issuance of postdated checks as demonstrating Hudson's bad financial situation. At least as to all the checks received by B&B after October 12, 1978, Donald Beebe had reasonable cause to believe Hudson to be insolvent.

However, B&B contends that 11 U.S.C. § 93g,[1] which precludes the allowance of a claim until a preference is surrendered, should not apply to claims that arise during the course of an administration. It urges that the debtor-in-possession is a different entity from the pre-bankruptcy company. It also points out that the purpose in requiring surrender of a preference is to secure equality of distribution among the general creditors. In this case, as an administration creditor, B&B is asserting a claim "against a separate fund which was segregated upon confirmation for payment of all outstanding administration claims against the estate. Assuming *arguendo* the disallowance of B&B's claim, the general creditors of the estate would receive no benefit. Thus, the purposes of Section 57g are not served by its application to disallow an administration claim." Pre-Trial Memorandum of David M. Green, Trustee of the Estate of B.B. Associates, Inc., Debtor, p. 3. B&B also notes the possibility of abuse if debts incurred during administration can be avoided by invoking the obligation to repay voidable preferences.

However, the Court of Appeals for the Eighth Circuit, in a similar situation in a case involving an employee's claim for wages, has concluded that § 57g allows of no exceptions. *In re Colonial Services Co.*, 480 F.2d 747 (8th Cir. 1973). In that case, the creditor rendered services as an employee during a Chapter XI proceeding. The trustee refused to allow the claim until Webber disgorged a preferential payment he had earlier received in an earlier amount. The employee objected, asserting that "his claim for services rendered in connection with the bankruptcy proceeding is a priority claim for an expense of administration rather than an unsecured claim for wages, and therefore that it can be allowed immediately and treated as an offset to repayment of the preference, rather than being held in abeyance until the preference is surrendered." 480 F.2d at 749. The Court of Appeals disagreed, saying that "the plain, unequivocal language" of § 57g, the same section as is relied on by Hudson in this case, "mandates surrender of an avoided preference before a claim can be allowed."

 While it is true that in this case permitting the preference to be set off against the amount otherwise owing this creditor will not increase the return to Hudson's other creditors, this does not justify the rewriting of a statute by this Court. Good reasons can be found in the concern of the bankruptcy laws for the future viability of a debtor for requiring surrender of preferences, whatever the immediate economic effect, and whoever benefits therefrom. That the two-year statute of limitations established by § 11e (former 11 U.S.C. § 29(e)) has long since run is of no consequence. The time limitation of § 11e does not apply to objections to the allowance of a claim unless voidable preferences are first surrendered. *In re Cushman Bakery*, 526 F.2d 23, 34 (1st Cir. 1975), *cert. denied*, 425 U.S. 937, 96 S.Ct. 1670, 48 L.Ed.2d 178 (1976).

 Turning now to the amount owed B&B. Except for the $38.50 paid out for a sample vest, Hudson has presented no justification for failure to pay B&B the amount owed it for commissions on orders procured prior to the termination of its exclusive agency. Hudson had no right to deduct from the amount owed B&B the sum that Hudson had voluntarily and gratuitously paid B&B's subagent, Taiwan-Scott, Ltd. Accordingly, B&B is entitled to the full amount due it for commissions, minus $38.50 and the $1,000 previously paid it on account.

---

**1.** Section 57g of the Bankruptcy Act provides: "The claims of creditors who have received or acquired preferences, liens, conveyances, transfers, assignments or encumbrances, void or voidable under this Act, shall not be allowed unless such creditors shall surrender such preferences, liens, conveyances, transfers, assignments, or encumbrances."

The commissions claimed to be owed on the Second Invoice are different. As to two sales set forth on the invoice, there is no evidence whatsoever to prove that they were actually made.

With reference to the other three sales, B&B has failed to carry its burden of establishing that it was the producing cause of those orders. It may well be that B&B is entitled to commissions on orders procured prior to termination of its employment, even if filled at a later date in the absence of an express agreement to the contrary. *Grattan v. Societa Per Azzioni Contonificio Cantoni*, 2 Misc.2d 861, 151 N.Y.S.2d 875 (Sup.Ct.N.Y.Co.1956) (and cases cited therein). However, it seems to this Court far more likely that Puro was the producing cause of those orders, not B&B, and that they all were placed after March 9, 1979 when Hudson terminated B&B's agency. Thus, the principle on which B&B relies is inapplicable.

B&B's fallback position is that it is entitled to its commissions, nevertheless. It contends that as long as Hudson sells to accounts which it originally procured, it must be paid commissions on such sales, regardless of the termination of the agency agreement. It cites in support of its position *Baum Associates, Inc. v. Society Brand Hat Co.*, 340 F.Supp. 1158 (E.D.Mo.1972), aff'd, 477 F.2d 255 (8th Cir. 1973). However, the fact that in the *Baum* case, the sales agent involved was successful in claiming commissions on the sales made subsequent to the termination of his agency does not mean that all sales agents are so entitled.

■ The right of a sales agent after his employment has terminated to continue receiving commissions on accounts he has solicited depends upon the nature of the agreement between the parties. *Entis v. Atlantic Wire & Cable Corp.*, 335 F.2d 759, 761–62 (2d Cir. 1964). The only writing produced by B&B is the brief letter which announces to someone associated with that firm that it is being appointed Hudson's "exclusive sales agent" in Korea. All that connotes is that for the period of that appointment, Hudson will use no other agent in Korea. It may also mean, as well, that all orders from Korea will be credited to B&B. There is nothing in the term "exclusive sales agent" that creates any obligation running past its termination. B&B produced no evidence respecting the nature of its agency, other than this brief and cryptic missive.

■ There is nothing in the phrase "exclusive sales agent" to suggest that Hudson intended to—or, in fact, did—obligate itself with respect to B&B to do anything other than pay B&B for whatever sales B&B produced while B&B was sales agent. Once B&B's agency was terminated, Hudson and B&B presumably became competitors for the business of the same companies, with Hudson under no obligation to compensate B&B if the business came to it rather than to someone else. In short, the Court can find no basis on the facts of this case for finding Hudson obligated to compensate B&B for the sales made to persons in Korea subsequent to the termination of B&B's agency, even if such sales were made to customers first secured by Hudson through the efforts of B&B.

## CONCLUSIONS OF LAW

1. B&B received preferential payments totaling $3,000 at a time when its President had reasonable cause to believe that Hudson was insolvent. Before any amount can be allowed it on account of its administration claims against Hudson, that money must be refunded to Hudson.

2. With respect to the sales shown on the First Invoice, B&B is entitled to sales commissions from Hudson in the amount of $3,600. The balance of B&B's commissions in the amount of $327.50 due on the other sales shown on the First Invoice are not owed by Hudson, but by Hudson's subsidiary, Featherworks.

3. B&B has failed to establish that any sums are due it as commissions under the Second Invoice.

4. Hudson has paid B&B $1,000 on account and is also entitled to debit B&B

with the cost of the down vest sent B&B, leaving a balance due of $2,561.50.

5. Since the preferential payments received by B&B exceed the amount of its administration claim, nothing is owed B&B by Hudson.

The foregoing constitutes the Court's Findings of Fact and Conclusions of Law in this proceeding.

Submit judgment.