165 F.3d 34
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
YALE SECURITY, INC., Plaintiff-Appellant,
v.
FREEDMAN SALES, LTD., and Rick M. Freedman, Defendants-Appellees.
 No. 97-1424.
 United States Court of Appeals, Seventh Circuit.
 Argued May 28, 1998.
Decided Sept. 25, 1998.
 
 Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 96 C 6501. David H. Coar, Judge.
 Before Hon. JOEL M. FLAUM, Hon. DANIEL A. MANION, Hon. DIANE P. WOOD, Circuit Judges.
 
 ORDER
 
 1
 In this diversity case, appellant Yale Security, Inc. ("Yale") sued for a judicial stamp of approval on its decision to terminate a contract between Yale and Freedman Sales, Ltd. ("Freedman"). In the contract, the parties had agreed to make Freedman a middleman between Yale and one of its important customers, W.W. Grainger, Inc. The district court dismissed Yale's complaint for failure to state a claim and entered final judgment against Yale on January 31, 1997. Before this court, Yale urges that it was entitled to the requested declaration either because the contract was wholly unenforceable for lack of mutuality of obligation, or because it was terminable at will and had properly been terminated.
 
 
 2
 According to the complaint, whose allegations we take as true at this stage of the proceedings, Freedman and Yale entered into an independent sales representation agreement on February 6, 1989 (the date Yale's representative signed the agreement). The agreement itself, which was attached to the complaint, recited that "due solely to the time and effort expended by Freedman, [Yale and another company] were introduced to and have entered into negotiations with W.W. Grainger, Inc." Grainger was a nationwide distributor of commercial and industrial equipment, and thus an important customer for Yale's hardware products. Under that agreement, Yale promised to pay Freedman a commission of "10 per cent of the gross sales price on all sales made by [Yale] to Grainger during the term of this agreement." Other than its reference to the term of the agreement, the contract did not specify how long this obligation to pay commissions would last. Paragraph 6, however, stated that the agreement would "terminate upon the happening of either of the following, whichever is longer: (a) The cessation of the business transacted by [Yale] with Grainger for any reason whatsoever. (b) Six months after [Yale's] PRODUCTS are no longer displayed or shown in Grainger's Motorbook."
 
 
 3
 Yale performed under the agreement for more than seven years. On March 28, 1996, however, it wrote to Freedman and announced that it planned to introduce a standardized sales representation agreement. Yale's letter informed Freedman that if Freedman failed to execute and return the superseding agreement within three weeks, the letter would serve as notice that Yale was terminating the original agreement effective May 1, 1996. Freedman wrote back advising that it did not believe Yale could unilaterally terminate the original 1989 agreement. Freedman warned that it would sue for contract remedies if Yale breached. Eventually, in a lawsuit filed on June 20, 1997--nearly five months after Yale's action was dismissed--it made good on this threat. See Freedman Sales, Ltd. v. Yale Security, Inc., No. 97 C 4441 (N.D.Ill.). Because no one has raised the point here, we express no opinion on the question whether Freedman's claim should have been raised as a compulsory counterclaim to Yale's request for a declaratory judgment, under Fed. R. Cir. P. 13(a), nor do we consider whether any defenses along these lines remain available to Yale in Freedman's litigation, which appears to be moving along through discovery at this point.
 
 
 4
 Yale filed the present action on October 4, 1996, seeking a declaratory judgment that the original 1989 agreement: (1) was unenforceable for lack of mutuality of obligation; (2) was terminable at will because it lacked an ascertainable duration; and (3) had been terminated effective May 1, 1996, by operation of the March 28, 1996 letter. Diversity jurisdiction was proper because Yale was a Delaware corporation with its principal place of business in North Carolina, Freedman is an Illinois corporation with its principal place of business in Illinois, and Rick Freedman is a citizen of Illinois; the amount in controversy was alleged to exceed $50,000, the amount then required under 28 U.S.C. § 1332. On Freedman's motion, the district court dismissed Yale's lawsuit with prejudice for failure to state a claim. On appeal, Yale has revived its original arguments and added another: (4) even if the agreement was not terminable at will, its duration was only for a "reasonable" period of time, which had either expired as a matter of law or, alternatively, was a question of fact that could not be resolved on a motion to dismiss.
 
 
 5
 * A. Mutuality of Obligation/Consideration
 
 
 6
 Yale initially argues that the 1989 agreement was unenforceable for lack of "mutuality of obligation" because Freedman was not bound to do anything in the future. This argument simply repeats the common law bromide that either both parties to an agreement are bound or neither is bound. See Carrico v. Delp, 141 Ill.App.3d 684, 95 Ill.Dec. 880, 490 N.E.2d 972, 974 (Ill.App.Ct.1986). The notion of mutuality of obligation is widely discredited, see, e.g., Restatement (Second) Contracts § 79 cmts. a, f; John D. Calamari & Joseph M. Perillo, Contracts § 4-12, at 226 (3d ed.1987); E. Allen Farnsworth, Contracts § 2.13 n. 3 (1990), and in any event the "requirement" was overstated all along. Under a strict mutuality theory, after all, no option contract could ever be valid. See Carrico, 95 Ill.Dec. 880, 490 N.E.2d at 975. Indeed, the Illinois Supreme Court recently said as much by noting that consideration, not mutuality of obligation, is what makes a contract enforceable. See McInerney v. Charter Golf, Inc., 176 Ill.2d 482, 223 Ill.Dec. 911, 680 N.E.2d 1347, 1351 (Ill.1997). Thus, properly articulated, Yale's argument is not that the contract is unenforceable for lack of mutuality, but rather that it is unenforceable for lack of consideration (presumably under the common law rule that consideration rendered in the past cannot form the basis of a binding contract). See Johnson v. Johnson, 244 Ill.App.3d 518, 185 Ill.Dec. 214, 614 N.E.2d 348, 355 (Ill.App.Ct.1993).
 
 
 7
 But even this framework poses problems for Yale, whose proposed application of the past consideration rule misunderstands that doctrine. The past consideration rule is the necessary extension of the bargain theory of contract and by definition applies only where a bargain is lacking. See Farnsworth, Contracts § 2.7; cf. Mills v.. Wyman, 20 Mass. (3 Pick.) 207 (1825) (father's promise made out of gratitude to repay the expenses of caretaker who tended to his ailing adult son held not enforceable). But here, as the prologue to the contract makes clear, Yale has admitted to having bargained for Freedman's services: "[D]ue solely to the time and effort expended by Freedman, [Yale was] introduced to and ha[s] entered into negotiations with W.W. Grainger, Inc.... [I]t is anticipated that due to the time and effort expended by Freedman that [Yale] will enter into agreements to sell certain PRODUCTS to Grainger.... Freedman expended said time and effort on behalf of [Yale] with the express intent of receiving consideration from [Yale] on all sales of PRODUCTS from [Yale] to Grainger." This language shows that, far from being mere "past consideration," Yale had an obligation to Freedman based on bargained-for and given consideration. Cf. Dickerson Realtors, Inc. v. Frewert, 16 Ill.App.3d 1060, 307 N.E.2d 445 (Ill.App.Ct.1974) (agreement to pay broker a commission was implied in law). The contract was merely the memorialization of that agreement. Accordingly, the district court properly rejected Yale's first argument.
 
 B. Contract Terminable At Will
 
 8
 Alternatively, Yale argues that because its contract with Freedman did not contain an express durational term, the contract was terminable at will. True enough, Illinois follows the general rule that contracts of "indefinite" duration are presumed to be terminable at will by either party. See Jespersen v. Minnesota Mining and Mfg. Co., __N.E.2d __, 1998 WL 319487 at * 1 & n. 1 (Ill., June 18, 1998). This presumption disfavoring perpetual contracts makes sense since, as the Illinois Supreme Court has explained, " '[f]orever' is a long time.... Today's fashion will tomorrow or the next day inevitably fall the way of the buggy whip, the eight-track tape and the leisure suit. Men and women of commerce know this intuitively and achieve the flexibility needed to respond to market demands by entering into agreements terminable at will." Id. at * 2. Yet for all the logic of the general rule, it would be just as illogical to apply the at will presumption mechanically, if to do so would contravene the intent of the parties. Cf. id.; Duldulao v. Saint Mary of Nazareth Hosp. Ctr., 115 Ill.2d 482, 106 Ill.Dec. 8, 505 N.E.2d 314, 318 (Ill.1987) (at will employment rule is mere presumption rebuttable by a showing of contrary intent). For example, even if a contract establishing a joint venture fails to specify a termination date, that agreement remains in force until the venture's purpose is accomplished or becomes impracticable. See Maimon v. Telman, 40 Ill.2d 535, 240 N.E.2d 652, 654-55 (Ill.1968); Scandinavian Airlines Sys. Denmark-Norway-Sweden v. McDonald's Corp., 129 F.3d 971, 973 (7th Cir.1997), citing Maimon. Accordingly, Illinois courts also hold that "[t]he duration of the agreement must be determined from a consideration of the agreement as a whole." Ricke v. Ricke, 83 Ill.App.3d 1115, 39 Ill.Dec. 598, 405 N.E.2d 351, 356 (Ill.App.Ct.1980).
 
 
 9
 Here, Yale and Freedman agreed their contract would terminate if Yale and Grainger stopped doing business, or six months after Grainger stopped featuring Yale's products in its catalogue, "whichever is longer." (This last phrase is a bit confusing. Since the parties have no way of knowing the timing or duration of either termination event ex ante, if read literally the only way one could give effect to the phrase would be to delay termination until both events came to pass.) Setting aside the clumsy drafting, the terms of the contract's durational paragraph lend themselves to only one reasonable construction: that far from creating a contract terminable at will, Yale and Freedman agreed they would measure their obligation by reference to specific, external events. This makes it, in the words of the Illinois Supreme Court in Jespersen, "[a]n agreement without a fixed duration but which provides that it is terminable only for cause or upon the occurrence of a specific event," 1998 WL 319487 at * 1, which the court said "is in one sense of indefinite duration, but is nonetheless terminable only upon the occurrence of the specified event and not at will." Id. The events that the Illinois Supreme Court found too vague in Jespersen to justify application of this rule were far more amorphous than those specified in the contract between Yale and Freedman. In urging this court to hold otherwise, Yale implicitly invites us read those terms out of existence. Under Yale's logic, the contract was necessarily terminable at will ab initio. That would mean that Yale could have piggybacked on Freedman's efforts in lining up the Grainger contract and, once that deal was inked, it could have escaped its obligation to pay by immediately invoking at-will termination. This interpretation defies all logic, and thus we decline to undermine the clear intent of the contract. See Northern Trust Co. v. Tarre, 86 Ill.2d 441, 56 Ill.Dec. 671, 427 N.E.2d 1217, 1221 (Ill.1981).
 
 
 10
 Although we found no perfectly analogous Illinois cases, the Pennsylvania Supreme Court has faced precisely the argument Yale is raising, and like us, it agreed that the "at will" paradigm was inapplicable. In Linn v. Employers Reins. Corp., 397 Pa. 153, 153 A.2d 483 (Pa.1959), the Employers Reinsurance Corporation agreed to pay a finder's fee of "5% on all reinsurance premiums received by the defendant from" a particular client the plaintiffs procured; the plaintiffs had no obligation to perform any additional work under the contract. Id. at 484. The defendant happily performed for 27 years. One day, it suspended payments, arguing that the contract was terminable at will because it failed to specify a durational term. Linn squarely rejected this argument and held that because the defendant had "received full performance from the plaintiffs ... [and had] accept[ed] the benefits of its agreement," it could not turn around and repudiate its obligations. Id. The Second Circuit also has addressed this issue. Faced with a situation involving a contract that called for the payment of sales commissions "[o]n all orders ... receive[d] and accept[ed] from customers ... at any time in the future," Judge Friendly began by noting the apparent tension between cases that strictly enforced finder's fee contracts and those that held that employment/commission contracts of indefinite duration were terminable at will. Entis v. Atlantic Wire & Cable Corp., 335 F.2d 759, 759, 761-62 (2d Cir.1964). But, continued Judge Friendly, such "conflict is more apparent than real." Id. at 762. Instead, the key was which party's interpretation of the contract was reasonable. Id., citing 3A Arthur L. Corbin, Contracts, § 684 (1960 ed.); cf. In re Velasquez, 295 Ill.App.3d 350, 229 Ill.Dec. 852, 692 N.E.2d 841, 847 (Ill.App.Ct.1998).
 
 
 11
 On these facts, Freedman's interpretation is the only reasonable one. All of the cases Yale cites (as well as the employment-at-will cases generally) are distinguishable from the contract with Freedman, because the latter was plainly intended to be a one-time transaction. Cf. R.J.N. Corp. v. Connelly Food Prods., Inc., 175 Ill.App.3d 655, 125 Ill.Dec. 108, 529 N.E.2d 1184 (Ill.App.Ct.1988) (court found that contract created an employment relationship under which broker was required to provide "regular services"). By contrast, the rationale underlying the employment-at-will doctrine "is that it would not be good policy to keep ... parties locked in the close relationship of employer-employee when one of the parties wishes to terminate it." Calamari & Perillo, Contracts § 2-9, at 61-62. No such concern exists here. Freedman delivered Grainger, and all that remained under the contract was for Yale to pay. The agreement to pay a percentage commission on Yale's sales to Grainger was simply a structured payment. The parties could have bargained for a lump-sum fee or the periodic payment of a fixed amount, but those terms would have been risky for both parties-Yale, because it might be overpaying if the Grainger account didn't pan out, and Freedman, because it might be undercharging if the account turned out to be a cash-cow. Instead, the parties agreed to split this risk by basing Freedman's fee on a commission that varied with gross sales. Yale was a sophisticated party-it could have bargained for a lower fee, a sunset term releasing it from its obligation after a period of years, or an absolute cap on what it could pay. It failed to do so, however, and the district court properly refused to protect it from its own oversight.
 
 C. Contracts For A "Reasonable" Time
 
 12
 Finally, Yale argues that even if the contract was not terminable at will, the parties intended it to be binding only for a "reasonable"period of time-a period that Yale argues has long since expired, or, at a minimum, was a question of fact that the district court improperly resolved at the motion to dismiss stage. Yale would like us to think that the only way to reject this argument is to conclude that the parties had intentionally agreed that their contract should last for an un reasonable amount of time. Consider, for example, if Freedman had assigned its right to receive payments under the contract to Rick Freedman, who in turn made a testamentary bequest of that contractual right in his will. Even though Illinois law permits the assignment of contractual rights, chances are we would look skeptically upon a claim by one of Rick's distant heirs that the Yale-Freedman contract intended to create a right that could be passed in perpetuity from generation to generation like an heirloom. Perhaps in that hypothetical case Yale's "reasonableness" argument would carry substantial force. Under slightly different facts, however-for example, if Freedman's assignment had been to a successor-in-interest corporation as part of a merger-perhaps not. Once again, under Illinois law it is the intent of the parties that matters. Unfortunately for Yale, the actual facts of this case do not mirror the outlandish hypothetical we just posed; worse yet, Yale failed to raise its "reasonable time" argument in opposition to the motion to dismiss. The point is therefore waived. See Rosser v. Chrysler Corp., 864 F.2d 1299, 1307 n. 7 (7th Cir.1989); Morris v. Jenkins, 819 F.2d 678, 681 (7th Cir.1987).
 
 
 13
 The district court's decision is AFFIRMED.