**COMPAGNIA IMPORTAZIONI ESPORTAZIONI RAPPRESENTANZE, Plaintiff,**

v.

**L–3 COMMUNICATIONS CORPORATION d/b/a L–3 Communications Corporation, Ocean Systems Division, Defendant.**

No. 06 Civ. 3157(NRB).

United States District Court, S.D. New York.

March 10, 2010.

Anthony J. Marchetta, Esq., Jeffrey Mannis, Esq., Day Pitney LLP, New York, NY, for Plaintiff.

Alan Gelb, Esq., Eugene P. Hanson, Esq., Jones, Hirsch, Connors & Bull, New York, NY, for Defendants.

## MEMORANDUM AND ORDER

NAOMI REICE BUCHWALD, District Judge.

Plaintiff Compagnia Importazioni Esportazioni Rappresentanze ("plaintiff" or "CIER") brought this suit against L–3 Communications Corporation d/b/a L–3 Communications Corporation, Ocean Systems Division ("defendant" or "L–3OS"), alleging claims for declaratory relief, breach of contract, fraudulent concealment, breach of the duty of good faith and fair dealing, quantum meruit, promissory estoppel, and for an accounting, arising out of L–3OS's alleged failure to pay CIER commissions earned pursuant to an International Representative Agreement signed in 2002. In an Order dated July 31, 2007, 2007 WL 2244062, this Court dismissed all but the breach of contract and declaratory judgment claims. Presently before the Court are the parties' cross-motions for summary judgment.

## FACTS[1]

### I. Background

Plaintiff CIER is an Italian company that provides services including consulting, technical advising, and sales assistance for advanced military sonar equipment suppliers within Italy and the broader European defense market. CIER Statement of Undisputed Material Facts ("CIER SOF") ¶ 1. CIER markets itself based on its extensive contacts within the Italian military and defense market, through which it promotes and sells the products of clients. *See* CIER SOF ¶ 19.

Defendant L–3OS, a Delaware company and former client of CIER, is the current owner of the Ocean Systems ("OS") business. First Amended Complaint, ¶ 3. CIER has served as the sales representative for the OS business since it was owned by Bendix, dating from at least 1983. L–3OS Statement of Undisputed Material Facts ("L–3 SOF") ¶ 3. These business dealings have involved a range of products over time.[2] By October 1985, Allied Signal

1. The facts below are as set out in the cited submissions, which are generally to the parties' statements made under Southern District of New York Local Rule 56.1. Unless noted, the specific fact stated has not been materially disputed by the opposing party in their Opposition Statement under Local Rule 56.1(B) and (C), though at times other facts within the numbered paragraph may have been disputed. Where the Opposition Statement provides narrowing or clarification of the citation, it is also cited.

2. Beginning at least by 1983, CIER was engaged by L–3OS and its predecessors under a series of Sales Representative Agreements to serve as a sales representative for many different products and services to military buyers in Italy, earning commissions on sales proceeds when CIER participated in effecting a sale. L–3 SOF ¶¶ 3, 40; CIER Opposition Statement Under Local Rule 56.1(B) and (C)

had acquired the OS business, becoming Allied Signal Ocean Systems (ASOS). ASOS continued the relationship with CIER. L–3 Communications Corporation's Memorandum of Law on Cross–Motions for Summary Judgment ("L–3 Mem."), 14; L–3 SOF ¶ 41; CIER Opp. ¶ 41. In March 1998 L–3 acquired the assets of the OS business from Allied Signal. L–3 Mem., 16. The resulting company, L–3OS, is the defendant here. The OS business is the developer and producer of Helicopter Long Range Active Sonar ("HELRAS"). L–3 SOF ¶¶ 14–18. HELRAS is a dipping sonar system that is lowered from a helicopter into the ocean. The system transmits and receives signals that detect submarine targets. L–3 SOF ¶ 16; CIER SOF ¶ 4.

In the late 1970s, ASOS demonstrated HELRAS successfully for the Italian Navy in an effort to promote sales in Italy. L–3OS SOF ¶¶ 18, 20. Subsequently, the Italian Navy became interested in pursuing production of a fleet of EH–101 helicopters with HELRAS dipping sonar technology. L–3 SOF ¶¶ 19, 20.

Between October 1985 and the period of time at issue here, CIER was engaged by L–3OS and its predecessors to promote the HELRAS program under a series of Service and Consulting Agreements. L–3 SOF ¶ 3; CIER Opp. ¶ 3. Between 1985 and 1995, ASOS and CIER entered into a series of these agreements designed to compensate CIER for work promoting HELRAS to the Italian Navy, whereby CIER was paid $20,000 per quarter. L–3 SOF ¶¶ 35–37, 41. The Service Agreements were designed to compensate CIER for its role as the "eyes and ears" of ASOS in Italy and for its promotion of HELRAS. L–3 SOF ¶ 40. This mechanism of compensation was used because HELRAS was still in the developmental stage, so there were no products for CIER to sell on commission. Thus, while the Representative Agreements compensated CIER for sales made of various other products, the Service Agreements allowed CIER to be compensated for its work on HELRAS during the early stages of that program. L–3 SOF ¶¶ 46, 47.

During this period, CIER and L–3OS first worked to promote HELRAS as the official selection by the Italian Navy for its EH–101 helicopters. CIER SOF ¶ 20. While they succeeded in convincing the Italians as to the value of the product, interest throughout the industry shifted from the EH–101 series of Italian helicopters to a smaller H–90 helicopter being developed under the auspices of NATO as part of a joint four nation program. L–3 SOF ¶ 21; CIER SOF ¶ 25. The four nation program was called the NATO Helicopter Management Agency ("NAHEMA") and included representation from France, Germany, Italy, and the Netherlands. L–3 SOF ¶ 21; CIER SOF ¶ 27. The structure of the program was such that NAHEMA designated a joint venture called NH Industries S.A.S. ("NHI") as the principal contractor for the program. NHI was composed of one contractor from each of the four representative countries. NHI was tasked with the design and production of the NH–90 helicopter program, a portion of which were to be equipped with long-range dipping sonar devices. The Italian representative to the joint venture, Agusta, was selected to lead the design and production of the platform technology for the helicopter's sonar system. CIER SOF ¶ 30; L–3 Opp. ¶ 30.

HELRAS was one type of such dipping sonar, and thus CIER was retained by

("CIER Opp.") ¶ 3; *see, e.g.,* Gelb Aff. Exhs. 49, 50 (Sales Representative Agreement and

Rider between The Bendix Corporation and CIER, effective January 1, 1983).

ASOS to promote the selection of HEL-RAS for incorporation into this program. There were several obstacles to the fulfillment of this goal, however, including that (1) the HELRAS design was at the time too large to be used effectively on the NH-90 helicopters, and (2) the NAHEMA program required that the sonar equipment be purchased from a manufacturer within one of the four participant countries. L-3 SOF ¶ 22. In an effort to comply with the nationality requirements of the program, ASOS bought German manufacturing company ELAC Nautik Gmbh ("ELAC"), and CIER helped broker a joint venture between ASOS and Finmeccanica, an Italian manufacturing company. *Id.* ¶¶ 23, 24, 32. As negotiations continued, Finmeccanica became the prime contractor for the venture's NH-90 bid, leaving ASOS as a subcontractor receiving only a portion of the business from the contract bid. *Id.* ¶¶ 24, 30; CIER SOF ¶ 49. The bid was eventually made with FIAR S.p.A., a subsidiary of Finmeccanica (which later became Galileo Avionica S.p.A. ["Galileo"]), ELAC, and a Dutch company called Fokker. L-3 SOF ¶ 25; CIER SOF ¶ 49; *see also* Certification of Anthony J. Marchetta ("Marchetta Cert."), Exh. 16 (Manufacturing License and Technical Assistance Agreement between Allied Signal Inc. and FIAR, dated Nov. 18, 1996). Under the July 1, 1995 Service Agreement, CIER's fee was increased to $50,000 per quarter due to the increased effort on their part to arrange

the bid and procure the subcontract. L-3 SOF ¶¶ 42, 62.

In early November 1996, Agusta selected a different sonar producer for the NH-90 program. CIER SOF ¶ 32; L-3 SOF ¶ 53. This was obviously disappointing to ASOS. Thereafter the Italian Navy,[3] ASOS, and CIER began a campaign to reverse Agusta's decision. L-3 SOF ¶ 54. There is some dispute as to exactly how that campaign transpired, but no one contests that CIER played a role in the efforts and that the decision was reversed in early 1998, when Agusta selected the bid led by Finmeccanica and including ELAC to supply the dipping sonar. L-3 SOF ¶¶ 54-58; CIER Opp. ¶¶ 54-58. L-3 purchased the OS business from ASOS in March of 1998, becoming L-3OS. CIER SOF ¶ 84; L-3 Mem., 14.

By the end of 1999, the NH-90 program was in development but L-3OS had not been awarded a production sub-supply contract yet. L-3 SOF ¶¶ 59-62. HEL-RAS was thus still not bringing funds into L-3OS that could be used to compensate CIER on a commission bases. L-3 SOF ¶ 64. From October 1999 through the award of that sub-supply contract, discussed below, CIER's service and consulting relationship continued through Consulting Agreements between CIER and L-3OS. L-3 SOF ¶ 62. There were also two Representative Agreements signed with varying provisions as to the specified products covered.[4] *See, e.g.* Affidavit of Alan

---

**3.** The Italian Navy sought to use HELRAS on their EH-101 helicopters, but did not want to have two different types of sonar on its own versus its NATO helicopters. Thus, it worked with CIER and L-3OS to reverse Agusta's selection of a different manufacturer's sonar technology. L-3 SOF ¶¶ 28, 55, 56; CIER SOF ¶¶ 33, 42.

**4.** After the expiration of the 1999 Consulting and Representative Agreements, on August 9, 2001, L-3OS sent CIER a "Disclaimer letter"

noting that CIER was not authorized to "perform services for L-3OS beyond the expiration date of the current agreement." Gelb Aff. Exh. 40 (Letter from Victor M. Riehl of August 9, 2001, acknowledged by Roberto Bolla for CIER); *see also* L-3 SOF ¶ 84. The letter continued, "there is no expressed or implied commitment by L-3OS to engage you or compensate you beyond the term of the current agreement." L-3 SOF ¶ 84. CIER acknowledged and agreed to the letter's statements. L-3 SOF ¶ 85. The agreements dis-

M. Gelb ("Gelb Aff."), Exh. 70 (signed by CIER on Sept. 14, 1999). The most recent agreements are discussed below.

## II. The contracts between L–3OS and CIER at issue here.

At issue here are the International Representative Agreement ("Representative Agreement") and the International Consulting Agreement ("Consulting Agreement"), both signed on April 1, 2002. Gelb Aff. Exhs. 26 (Representative Agreement), 65 (Consulting Agreement). The "Duties" section of the Representative Agreement is identical to the "Duties" section of the Consulting Agreement though they reference appendices with differently defined terms. *See* Gelb Aff., Exh. 26, App. A (covering products and services "for end use in the 4–Nation NH–90 Helicopter Program," defining the Territory as Italy, and stating the term to be two years from date of final execution or earlier termination); Gelb Aff. Exh. 65, App. A (referencing Exh. A for definition of services as set out below).

In keeping with prior consulting agreements, the 2002 Consulting Agreement provided for a $50,000 fee payable quarterly for services performed in "[p]romotion and consulting for continued acquisition maintenance of NH–90 Design and Development Contract effort to ensure maximum follow-on production among the nations involved in the 4–Nation NH–90 Helicopter Program." Gelb Aff. Exh. 65, App. A, Exh. A. As in past agreements, CIER's payments were to be made following approval by L–3OS of CIER's submissions regarding services rendered. By its terms, the 2002 Consulting Agreement expired upon the award of the Sub–Supply Contract to L–3OS. CIER SOF ¶ 103.

The 2002 Representative Agreement provided that the products and services it covered included "L–3OS products and services related to the **4–nation NH–90 Helicopter Program** and services sold in connection with other NH–90 Helicopter programs for non-Italian end use." Gelb Aff. Exh. 26, App. B, ¶ 2. In the "Compensation for Services" section, the Representative Agreement provided that:

> Company [L–3OS], either as a prime contractor or a subcontractor, agrees to pay to Representative [CIER] **a commission as set forth in the applicable Appendix B,** attached hereto, **on the sale** of the Products and Services for use in the Territory [Italy], provided that Representative has fulfilled its duties as set forth in Article 1 above in connection with such sale.

> For purposes of determining whether Representative is entitled to a commission, the determination whether Representative has fulfilled its duties in connection with such sale shall be within the sole judgment and discretion of Company which shall not be exercised in an unreasonable manner ... Said commission will be paid in U.S. Dollars and ... **each such commission payment shall be based on the Net Sales Price (as defined in Appendix B) on payments received from customer** and shall be paid within sixty (60) days of receipt and acceptance by Company (as specified in Appendix B) of a proper original invoice and supporting document.

Gelb Aff. Exh. 26, ¶ 4 (emphasis added). Appendix B of the agreement defined how compensation would be payable:

> Subject to the requirements of Article 4 of this Agreement in which this Appendix B is incorporated, a **commission for direct commercial sales,** based on the

cussed in the next section, signed in April 2002, followed this exchange.

Net Sales Price of Products and Services ..., will be payable as follows: **1. Five percent (5%) on the products/programs coverage identified in Paragraph 2(a) and 2(b) preceding [including the NH–90 program] that are sold in the Territory as a result of services performed and pursuant to the terms and conditions of this Agreement.** *id.* at App. B, ¶ 3(A) (emphasis added). The contract goes on to define "net sales price" as "the U.S. dollar value of any **contract order entered into between Company and a customer in the Territory [Italy] for the Products and Services....**" *Id.* at App. B, ¶ 3(C) (emphasis added).

The Representative Agreement was to remain in effect for two years from the date of execution, but was extended through July 31, 2004. L–3 SOF ¶ 203. The Representative Agreement was not renewed thereafter. CIER SOF ¶ 115.

### III. The contract awarded during the effective period of the 2002 Representative Agreement.

On December 21, 2002, Galileo Avionica (the success or of Finmeccanica) awarded the production sub-supply contract to ELAC, L–3OS's subsidiary. *See* Gelb Aff. Exh. 37 (Contract Between Galileo Avionica and ELAC Nautik GmbH for the Production Investment, Production and Product Support Phases of the Dipping Sonar Subsystem/LRU's Set/Materials Kit [Equipment] for the NH90 Programme, signed December 21, 2002 (the "Sub–Supply Contract")); *see also* L–3 SOF ¶ 96.

Through this agreement, Galileo contracted with ELAC for the latter to supply the sonar systems contemplated by the original contract between NAHEMA and NHI ("the Main Contract").[5] CIER SOF ¶ 57; Gelb Aff. Exh. 37, Art. 3.1. The Sub–Supply Contract provided that:

The Buyer [Galileo] is **hereby committed to buy** from the Supplier [ELAC] a **minimum quantity of Equipment composed by 5 (five) DSS, 5 (five) Materials KIT and 55 (fifty five) LRU's SET.** To fulfill this **commitment** the Buyer **shall** place multiple Purchase Orders in accordance with the following conditions:

- The first Purchase Order shall be placed by the Buyer for the supply of 5 (five) DSS, 5 (five) Materials KIT and 15 (fifteen) LRU's SET, to be delivered in accordance with Annex D "Master Plan" and shall include the relevant PI activities.

- Each subsequent Purchase Order(s) shall be consequent to the Agusta S.P.A. Purchase Order(s) to the Buyer, and shall be placed in such a way that the continuity of production is guaranteed to the Supplier. This means that any subsequent Purchase Order(s) shall be placed by Agusta to the Buyer (and consequently by the Buyer to the Supplier) at least 18 (eighteen) months before the delivery date of the last Equipment under the previous Purchase Order and the related delivery dates shall be in accordance with Annex K(SOR).

---

**5.** The Sub–Supply Contract references the "Main Contract" as the relevant contract on which the sub-supply agreement between Galileo and L–3OS was based. Gelb Aff. Exh. 37, Article 3.1. It further defines the "Main Contract" as "the contract PI/P 001 dated June 30th 2000, signed by NAHEMA and NHI for the additional design and development, production investment, production and initial product support of the first batch of 243 (two-hundred-forty-three) Helicopters inclusive of an option for up to 55 (fifty-five) additional Helicopters, and any further contract placed by NAHEMA." *Id.* at Article 2.

In the event that the Buyer will not fulfill the above obligations, the Supplier shall have the right to apply the provisions stated in Art. 5.3 or to terminate the Contract as per article 37.

Gelb Aff. Exh. 37, Art. 4.1(emphasis added). Article 37 of the agreement provides for termination as a remedy for Galileo's failure to fulfill the "obligations" under the agreement or upon certain other events. *Id.* at Art. 37. Article 5.3 provides for the price term of the products as well as the right to renegotiate if Buyer fails to fulfill its obligations under Article 4.1. *Id.* at Art. 5.3.

As contemplated by Article 4.1 of the Sub–Supply Agreement, Galileo issued Purchase Order No. 4541002913, dated December 20, 2002. CIER SOF ¶ 58. This purchase order requested delivery of 20 units of equipment: "5–DSS, 5–Kits, and 15–LRUs."[6] L–3 SOF ¶ 96; CIER SOF ¶ 58. This is the only purchase order that has been issued to date. CIER SOF ¶ 66; L–3 SOF ¶ 103. CIER maintains that since that contract was signed, L–3OS has received, at least, $22,227,290.23 from Galileo for deliveries and milestones made under the first purchase order. CIER SOF

¶ 77. To date, L–3OS has paid CIER one commission under the Representative Agreement based on the advanced payment received from Galileo for certain milestones as set out in the Sub–Supply Contract. CIER SOF ¶ 126.

## IV. The business relationship since the award of the Sub–Supply Contract.

The business relationship between L–3OS and CIER had begun to deteriorate by the end of 2002 and eroded further throughout 2003.[7] While the 2002 Representative Agreement was extended from March 31, 2004 to July 31, 2004, it was not renewed further. L–3 SOF ¶¶ 203, 204; CIER Opp. ¶¶ 203, 204. L–3OS acknowledges that commissions were owed and paid on certain milestone payments received by L–3OS prior to the Representative Agreement's expiration. L–3 SOF ¶¶ 133, 134. However, L–3OS now maintains that no commissions are owed to CIER on payments received after the agreement's expiration, which CIER disputes. Both sides acknowledge that all invoices for payments received prior to the expiration of the contract have been paid by L–3OS.[8] L–3 SOF ¶ 219, CIER Opp. ¶ 219.

---

**6.** The Sub–Supply Contract defines "Equipment" as "deliverable hardware, the Supplier has to industrialise [sic], manufacture and deliver to the Buyer in accordance with provisions of this Contract and any Agreed Purchase Order. 'Equipment' can identify either: DSS (Dipping Sonar Subsystem): To the extent of the present Contract the DSS is composed by the following Units (LRU): Submersible Unit (SU), Funnel (FU), Watershield (WS), Dome Control (DC), Cable Interface Power Supply (CIPS), Reeling Machine (RM), Cable Set (CS), Reel (R) and Latch (L), duly assembled and tested. Or, Materials KIT: Set of unassembled materials for DC + CIOS + RM + CS + R + L, duly packed following part list criteria. Or, LRU'S SET: Units SU + FR + WS duly assembled and tested." Gelb Aff. Exh. 37, Art. 2. The exact components currently on order have been

amended, however, and are reflected in the currently in force Annex K, as amended April 11, 2008. *See* Gelb Aff. Exh. 56 (Annex K as amended).

**7.** By September 2003, an email was sent to CIER acknowledging CIER's role in the award of the NH–90 contract but also discussing L–3OS's belief that the "mutual relationship, teamwork, and overall effectiveness has degraded" since the time of the award. L–3 SOF ¶¶ 199, 200.

**8.** While CIER does acknowledge that it has been paid on all invoices it has submitted (after notification by L–3OS of payments received from Galileo prior to termination of the Representative Agreement), CIER maintains that there have been subsequent pay-

Since the expiration of the Representative Agreement, continuous delays in the production schedule of the NH–90 helicopter program have resulted in disruptions to the delivery schedule under the Sub–Supply Contract and thus the HELRAS production process. In November 2006, L–3OS stopped work on the sonar units and did not resume until March 2008. L–3OS ¶ 230. The second purchase order, which was to be issued by October 2007 under the Sub–Supply Contract, has not yet been issued. In a document dated April 11, 2008, Galileo and L–3OS executed Amendment 1 to the Sub–Supply Contract, including renegotiated terms [9] for the delivery schedule of the items under the first purchase order and extended delivery through June 2011. Gelb Aff. Exhs. 55, 56; CIER SOF ¶¶ 81, 82; L–3 SOF ¶¶ 234–236. The amended contract does not include dates for delivery beyond the remaining deliveries under the first purchase order, though, as CIER points out, the original language regarding the minimum deliverables under Sub–Supply Contract Article 4.1 also appears in the amended contract. L–3 SOF ¶ 238; CIER Opp. ¶ 238. While the expectation under the amendment is still that future purchase orders will be made, further deliveries are have not yet been ordered. L–3 SOF ¶ 243; CIER Opp. ¶ 243.

## DISCUSSION

CIER now seeks relief on two counts. First, CIER seeks a declaratory judgment defining its right to collect commissions on any future deliveries made as part of the "minimum quantity" contemplated by the Galileo Sub–Supply Contract. Second, CIER alleges that defendant breached the 2002 Representative Agreement when it failed to pay CIER a commission on the payments it received from Galileo for deliveries of sonar equipment pursuant to the Sub–Supply Contract. Defendant disputes any claim of entitlement to post-expiration commissions under the Representative Agreement. To address either claim, we must determine what rights and obligations regarding post-expiration commissions accrue under the Representative Agreement.

For the reasons set out below, and subject to certain qualifications, we find that CIER is entitled to a judgment declaring that L–3OS is obligated to pay CIER commissions under the Representative Agreement for payments it receives under the Sub–Supply Contract, even though such payments are made after the expiration of the Representative Agreement. We also find that if Galileo has made payments to L–3OS either before or since the expiration of the Representative Agreement for which commissions have not been paid, CIER is entitled to recover those commissions under Count II.

## I. The Summary Judgment Standard

This matter is now before the court on the parties' cross motions for summary judgment. Summary judgment is appropriate only if "there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." *Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of N.J., Inc.,* 448

---

ments received by L–3OS from Galileo on which it is owed commissions and for which it has not yet been able to submit invoices.

9. This process is contemplated by Article 5.3 of the Sub–Supply Contract. Gelb Aff. Exh. 37, Art. 5.3. The price term was amended,

though L–3 maintains this was as a result of the removal of three components of the deliverable equipment (the latch, funnel, and watershield). L–3's Opposition Statement Under Local Rule 56.1(B) and (C) ("L–3 Opp.") ¶ 81.

F.3d 573, 579 (2d Cir.2006) (quoting *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir.1998)) (internal quotation marks omitted); *see also* Fed.R.Civ.P. 56(c). Summary judgment should not be granted unless "no rational finder of fact could find in favor of the non-moving party." *Carlton v. Mystic Transportation, Inc.*, 202 F.3d 129, 134 (2d Cir.2000).

The mere existence, however, of an alleged factual dispute between the parties will not defeat a motion for summary judgment because "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original). In order to defeat such a motion, the non-moving party must affirmatively set forth facts showing that there is a genuine issue for trial. *Id.* at 256, 106 S.Ct. 2505. An issue is "genuine ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505 (internal quotation omitted); *see C.R. Bard, Inc. v. Advanced Cardiovascular Systems, Inc.*, 911 F.2d 670, 672–73 (Fed.Cir.1990).

To raise a genuine issue, a non-moving party may not "rely on mere speculation or conjecture as to the true nature of the facts." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987); *see also Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir.1995). " 'Mere conclusory allegations or denials' in legal memoranda or oral argument are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980) (citation omitted). Rather, the non-moving party must produce specific facts sufficient to establish the existence of a genuine issue of fact.

*See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Lipton*, 71 F.3d at 464. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505 (citations omitted).

## II. Contract Interpretation

CIER claims that it is entitled to commissions on payments received by L–3OS under the Sub–Supply Contract, even after the expiration of their contractual relationship with L–3OS. Plaintiff bases this claim on the 2002 Representative Agreement's compensation provisions. *See* Gelb Aff. Exh. 26, App. B (2002 Representative Agreement).

■■■ The threshold issue for a court in any contract dispute is to determine whether the language of a contract is unambiguous. In interpreting contractual agreements, the "fundamental objective" of the court "is to determine the intent of the contracting parties 'as derived from the language employed in the contract.' " *Consolidated Edison, Inc. v. Northeast Utilities*, 426 F.3d 524, 527 (2d Cir.2005) (citing *Abiele Contracting v. N.Y. City Sch. Constr. Auth.*, 91 N.Y.2d 1, 9, 666 N.Y.S.2d 970, 689 N.E.2d 864 (1997)). "Where the contract is clear and unambiguous on its face, the courts must determine the intent of the parties from within the four corners of the instrument." *Id.* (quoting *Meccico v. Meccico*, 76 N.Y.2d 822, 824, 559 N.Y.S.2d 974, 559 N.E.2d 668 (1990)). However, where a contract is ambiguous, "extrinsic evidence may be considered 'to ascertain the correct and intended meaning of a term' or terms." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 178–79 (2d Cir. 2004) (quoting *Alexander & Alexander Services, Inc. v. These Certain Underwrit-*

*ers at Lloyd's, London, England,* 136 F.3d 82, 86 (2d Cir.1998)).

■■ Further, "[a]scertaining whether or not a writing is ambiguous is a question of law for the trial court." *Morse/Diesel, Inc. v. Trinity Industries, Inc., et al.,* 67 F.3d 435, 443 (2d Cir.1995) (quoting *Sayers v. Rochester Telephone Corp. Supplemental Mgmt. Pension Plan,* 7 F.3d 1091 (2d Cir.1993)). "Under New York law Contract language is ambiguous if it is capable of more than *one* meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Id.* However, if the words of the contract convey a definite and precise meaning where there is no reasonable basis for a difference in opinion, summary judgment may be granted. *Seiden Associates, Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir.1992). Arguments made by the parties that include differing meanings for a provision do not necessarily mean a provision is ambiguous. *Id.*

### III. Contracts at Issue Here

#### A. The 2002 Representative Agreement

■ Plaintiff contends that the 2002 Representative Agreement provided for commissions on all sales related to the NH–90 program made during the effective period of the contract, including the Sub–Supply Contract. Defendant makes several arguments to the contrary, maintaining that plaintiff is not entitled to any commissions after the expiration of the Representative Agreement in 2004. Specifically, defendant argues that: (1) the Sub–Supply Contract was signed under the contemporaneous Consulting Agreement, rather than the Representative Agreement, so no commissions ever accrued under the Representative Agreement; (2) even if the Sub–Supply Contract was procured under the Representative Agreement, CIER had uncompleted continuing responsibilities after the order was placed so no commissions were earned prior to the expiration of the Representative Agreement; and (3) the course of dealings between L–3OS and CIER demonstrates that historically no payments were made in the absence of an effective agreement. Defendant also argues that the Sub–Supply Contract is not a binding commitment to purchase any specific quantity of equipment and therefore can not serve as the basis for a claim to commissions after the Representative Agreement had expired. We will address the first three arguments regarding the Representative Agreement then address the Sub–Supply Contract.

#### 1. The provision for commissions on all sales related to the NH–90 program is unambiguous.

Defendant argues that the intention of the parties was for CIER's work in obtaining the Sub–Supply Contract to be compensated by the quarterly payments made under the International Consulting Agreement signed on the same day as the Representative Agreement, rather than through commissions under the Representative Agreement. This argument is advanced despite the facts that: (1) the Representative Agreement was clearly in force at the time of the signing of the Sub–Supply Contract on December 21, 2002; [10]

---

10. The Representative Agreement states: "This Agreement, unless terminated in accordance with the provisions of Article 12 hereof, shall become effective upon execution by all parties and shall remain effective for the term set forth in Appendix A." Gelb Aff. Exh. 26, App. B, ¶ 2. Appendix A states the "term" as "two years from date of final execution or

(2) the Representative Agreement clearly states that the products and services upon which compensation will be awarded include "[a]ll L–3OS products and services related to the 4–nation NH–90 Helicopter Program," Gelb Aff. Exh. 26, App. B, ¶ 2(b), which is especially salient given that the parties clearly contemplated (and were actively seeking) the procurement of the Sub–Supply Agreement at the time of the Representative Agreement's signing on April 1, 2002; (3) the Sub–Supply Contract is clearly a sale of NH–90 products;[11] and (4) defendant offers no explanation of why there was a Representative Agreement with such terms in addition to the Consulting Agreement if it was not intended to cover commissions on these products.

Accordingly, we reject defendant's position that the Representative Agreement did not provide for commissions *on* the Sub–Supply Contract, which explicitly included compensation for the sale of products relating to the NH–90 program.[12]

**2. The commission accrual and payment provisions of the Representative Agreement are unambiguous.**

Defendant argues that, under the terms of the Representative Agreement, CIER was required to complete certain continuing duties until delivery before it could be considered to have earned its commission. Based on that reading, L–3OS argues that no commissions are owed under the Sub–Supply Contract's commit-

ment because no deliveries had been made before the Representative Agreement had expired. Further, defendant asserts that plaintiff is not entitled to any post-expiration commissions, based on New York's *Entis* line of cases. Defendant interprets this case law as holding that where a sales representative has a continuing role in procuring sales from its customer, commissions are not payable after the representative's employment contract has expired. *See* L–3 Mem. Point II(E). However, defendant misreads this line of case law, which actually stands for the proposition that the contract between the parties governs when the commissions are earned and therefore whether they are to be paid even after the expiration or termination of the contract. *See Yale Security, Inc. v. Freedman Sales, Ltd.,* No. 97–1424, 1998 WL 690944 (7th Cir.1998) (finding that "the key [to the holding of *Entis* ] was which party's interpretation of the contract was reasonable"); *In re Hudson Feather & Down Products, Inc.,* 22 B.R. 247 (E.D.N.Y.1982) (citing *Entis* for proposition that "[t]he right of a sales agent after his employment has been terminated to continue receiving commissions on accounts he has solicited depends upon the nature of the agreement between the parties."); *see also World Wide Communications, Inc. v. Rozar, et al.,* No. 96 Civ. 1056(MBM) (NRB), 1997 WL 795750, *11 (S.D.N.Y.) (finding that the court is required to give effect to the parties' inten-

---

until such earlier termination of Representative's Agreement as provided herein." *Id.* at App. A, ¶ 3.

**11.** The relevant language from the Sub–Supply Agreement is set out above in Facts Section III.

**12.** Additionally, we note that the course of performance between the parties under the 2002 Representative Agreement demonstrates

that after the Sub–Supply Contract had been signed, L–3OS determined that CIER had earned commissions on the payments L–3OS received from Galileo under the Sub–Supply Contract. Specifically, CIER was paid commissions on certain milestone payments received by L–3OS prior to the expiration of the Representative Agreement. This course of performance suggests that defendant's argument here is litigation driven.

tions in entering the agreement as derived from the language employed) (citing *Reefer and General Shipping Co., Inc. v. Great White Fleet, Ltd.*, 922 F.Supp. 935, 940 (S.D.N.Y.1996), *aff'd mem.*, 107 F.3d 4 (2d Cir.1997)). If the sales representative is found to have a contractual obligation requiring the completion of continuing duties prior to the earning of such a commission, this line of cases holds that the termination of the commission agreement prior to the completion of such duties terminates the right to earn commissions. Thus no commissions would be due after the relationship has ended. However, if the triggering event for the earning of commissions has occurred prior to termination, the commissions are payable after termination.[13]

We turn now to the terms of the Representative Agreement at issue here. The

relevant contract language addressing when commissions are earned states that commissions are earned "on the sale" of the relevant product, Gelb Aff. Exh. 37, ¶ 4(A), to be paid "based on the Net Sales Price . . . on payments received" where Net Sales Price is defined as the "U.S. dollar value of any contract order." *Id.* at ¶ 4(B), App. B, ¶ 3(C). Further, the Representative Agreement states that commissions are payable at five percent of the net sales price of products "that are sold." *Id.* at App. B, ¶ 3(A). Thus the contract clearly provides that the commissions are earned upon sale. Though there is additional language providing that L–3OS must confirm that CIER complied with its duties under the Representative Agreement in making the sale,[14] the operative

---

**13.** The cases cited by the defendant are not to the contrary and in fact are supportive of this analysis. *See Coletti v. Knox Hat Co.*, 252 N.Y. 468, 169 N.E. 648 (1930) (holding that the performance of services for an entire year was a condition precedent to payment); *Sommer v. Edward Ermold Co.*, 92 N.Y.S.2d 326, 327, 275 A.D. 629 (1st Dep't 1949) (finding that commissions are generally deemed to accrue upon "performance of services in the procurement of orders accepted by his employer" unless the contract provides otherwise); *Entis v. Atlantic Wire & Cable Corp.*, 335 F.2d 759 (2d Cir.1964) (citing two lines of cases: (1) "finders fee" cases where fees continue to be payable after employment has terminated and (2) cases where a salesman has a continuing role and should be treated as an employee at-will earning compensation during only the term of employment; but ultimately finding the conflict between the two lines of cases is "more apparent than real" and holding that, where a contract is very informal, generally the surrounding facts should be looked to in order to determine which parties' interpretation is reasonable); *Simas v. Merrill Corp.*, 2004 WL 213013 (S.D.N.Y. Feb. 4, 2004) (holding that the resolution of a claim for post-termination commissions turns on when the commissions are first earned according to contract language).

**14.** The Representative Agreement provides that L–3OS has the right to refuse payment of commissions if it determines that CIER has not completed its duties under Article 1. Gelb Aff. Exh. 26, ¶ 4(A) (stating that L–3OS "agrees to pay to Representative a commission as set forth in the applicable Appendix B . . . provided that Representative has fulfilled its duties as set forth in Article 1 above in connection with such sale."). Defendant argues that the duties listed require on-going involvement with the customer, such that commissions are not earned until the completion of this continued liaison. Not only is this reading inconsistent with the language in the remainder of the document, it is also not the most reasonable reading of these provisions, Any language in the "Duties" section of the Representative Agreement that even arguably contemplates a continuing relationship between CIER and the customer describes activities that, by their very nature, would occur in advance of any sale. *See* Gelb Aff., Exh. 26, ¶ 1(C) (requiring, for example, the reporting of information regarding sales opportunities generally and the provision of marketing assistance with respect to customer needs and competitor activities generally). While the Representative Agreement clearly contemplates a continuing relationship between CIER and L–3OS, nothing in the

time for evaluation is clearly the "sale." Thus, while no deliveries had been made when the Representative Agreement expired, the commissions on the sales made in the Sub–Supply Contract had already accrued based on Galileo's commitment to buy the equipment from L–3OS in the Sub–Supply Agreement.

This, however, does not end our analysis. While the 2002 Representative Agreement unambiguously provides that commissions are earned at the time of sale, the amount of the commissions is "based on Net Sales Price ... on payments received from customer and shall be paid within sixty (60) days of receipt and acceptance by Company (as specified in Appendix B) of a proper invoice and supporting document." *Id.* at ¶ 4. The fact that the commissions are not payable until L–3OS receives payment from Galileo does not change the result as to when commissions are *earned* by CIER, although it does condition the *payment* to CIER of any commissions earned on the receipt of payment by L–3OS from Galileo. Thus, CIER is currently owed commissions on payments that L–3OS has received under the Sub–Supply Contract and will be owed commissions on future payments made by Galileo as they are received by L–3OS.[15]

At bottom, this reading not only accords with the language of the agreement, but it is also the reasonable construction of the Agreement because it accommodates for the inevitable gap between the placement of an order and the completion of the sonar equipment's production. If read otherwise, the contract would be inequitable for one of the parties—either in that CIER could be deprived of compensation for its sales efforts by L–3OS's unilateral decision not to renew the agreement or in that L–3OS might be forced to pay commissions immediately upon receipt of the order despite the long production phase prior to their own receipt of payment.[16]

3. **The course of dealings between the parties is not inconsistent with our reading of the Representative Agreement.**

As discussed above, where contract language is unambiguous, the court looks no further than the four corners of the document to determine the intention of the parties. *Consolidated Edison, Inc.*, 426 F.3d at 527; *see also R/S Associates v. New York Job Development Auth.*, 98 N.Y.2d 29, 32, 744 N.Y.S.2d 358, 771 N.E.2d 240 (2002) ("when parties set down their agreement in a clear, complete document, their writing should as a rule be

"Duties" section vitiates the clear language in the remainder of the document, which unambiguously states that the governing event for accrual of commissions is the sale to the customer. Moreover, the fact that certain commissions have already been paid by L–3OS to CIER with respect to money earned under the Sub–Supply Contract further supports the finding that L–3OS had determined that CIER had fulfilled its duties with respect to that sale. To the extent that L–3OS would now like the option of re-evaluating that determination, they are precluded from doing so because their decision not to renew the Representative Agreement prevented CIER from continuing to provide liaison services if any additional services were indeed owed.

15. Defendant also cites New York case law for the proposition that brokerage contracts can condition the broker's right to payment on complete performance of the agreement between buyer and seller. L–3 Mem., 28–29. We note that this argument is not contrary to the result here, where no payment on the commissions is owed until the contract is performed. Nor does this argument affect the section of the Representative Agreement that, as we have found, clearly provides that commissions are earned at the time of sale.

16. The Sub–Supply Contract itself contemplates a 17 month "lead-time" for the production of the equipment after a purchase order is issued. Gelb Aff. Exh. 37, Art. 7.3.

enforced according to its terms' ") (quoting *Reiss v. Financial Performance Corp.,* 97 N.Y.2d 195, 198, 738 N.Y.S.2d 658, 764 N.E.2d 958 (2001)). Thus, for the reasons discussed *supra,* we need not go beyond the text to make our ruling.

Nonetheless we note that, contrary to defendant's arguments, the course of dealings between the parties is not contrary to the language of the Representative Agreement. In this regard, defendant argues that: (1) the two parties here have a long history of contractual relationships and L–3OS's long-standing policy of "No Agreement, No Payment" [17] shows that that they did not intend to pay post-termination commissions; (2) CIER had previously signed a disclaimer letter indicating its awareness that it had no authority to act outside of a signed agreement; (3) payment to CIER had always been contingent on a determination of whether CIER's services were satisfactory and thus their determination that payment is unwarranted now must stand; and (4) prior Representative Agreements specifically used language prohibiting payment for deliveries "more than one year after … termination or cancellation," thus the absence of such language precludes the payment of post-expiration commissions on the 2002 Represen-tative Agreement. L–3 SOF ¶ 189; Gelb Aff. Exh. 22, 5(F)(2) (Sales Representation Agreement signed Nov. 3, 1997).

CIER counters that, first, the alleged policy was not in fact adhered to during the course of dealing between the parties in that L–3OS allowed the backdating of agreements to create the appearance of continuity. *See* CIER Opp. ¶ 189. Further, we note that such an internal corporate policy does not provide legal cover for L–3OS to avoid liability under a contract it agreed to be bound by. Second, CIER correctly points out that the disclaimer letter was specific to a prior contract and is not applicable to the current conflict. *See* Gelb Aff. Exh. 40 (Letter from Victor M. Riehl of August 9, 2001, acknowledged by Roberto Bolla). Regardless, both of these arguments miss the mark because, contrary to fact, they assume that there was no governing contract in place when the commissions were earned. Defendant's arguments in the third category are completely unavailing in that they have in fact already paid a commission to CIER after payment was received from Galileo under the Sub–Supply Contract, so to the extent the measuring date is the sale, L–3OS has already found that CIER's efforts in producing the sale were adequate.[18] L–

---

**17.** As set out in L–3OS's 56.1 Statement, "[t]he practice and policy at … ASOS … was that no consultant or representative was permitted to receive fees without an agreement in place that allowed him to do so." L–3 SOF ¶ 153. L–3OS maintains that this policy was good business and in line with the requirements of the Foreign Corrupt Practices Act ("FCPA"). *Id.* at ¶¶ 155–166. CIER challenges the relevance of the entirety of L–3OS's statements on this subject. *See* CIER Opp. ¶¶ 155–166.

**18.** In making this observation, we also obviate the need for discussion of whether the "procuring cause" doctrine governs whether CIER has earned the sale or whether the contract language creates an additional re-quirement that the contract be earned "as a result of" CIER's efforts. L–3OS admits that CIER is entitled to receive commissions for invoices on payments L–3OS received under the Sub–Supply Contract prior to the expiration of the Representative Agreement "because L–3OS had previously confirmed CIER's performance of services sufficient to permit payment of invoices covering those payments." L–3 Mem., 45 (citing Gelb Aff. Ex. 3, ¶ 35a). We further note that this conclusion is supported by the fact that the parties do not contest that CIER played a sufficient role in the winning of the Sub–Supply Contract, but only whether the Contract was procured under the Representative Agreement and whether CIER had continuing duties under the Representative Agreement before

3OS's final point is that, in light of its "No Agreement, No Payment" policy, and given the absence in the governing agreement of a specific authorization for one year of post-termination commissions as had been included in a prior contract, such post-termination payments would not have been authorized. L–3 SOF ¶ 189. However, as CIER points out, such language in prior agreements does not necessarily support L–3OS's argument concerning the operative agreement. *See id.* If anything the omission of the language in the 2002 Representative Agreement can as easily lead to the opposite conclusion: that there is no limitation on post-termination commissions absent contractual language to that effect because when the parties wanted to include a one-year limitation on post-termination payments they knew how to do so. Whether viewed singularly or in combination, the course of dealings arguments advanced by defendant do not undermine the unambiguous reading of the contract language, which is also the most reasonable.

## B. The Sub–Supply Contract

 Plaintiff claims that they are entitled to commissions on all sixty units contemplated by the Sub–Supply Contract, only twenty of which have been ordered by Galileo at this time. Defendant argues that (1) the claim of a "binding commit-

ment" by Galileo to purchase all sixty units is not supported by the contract language in that agreement, and that (2) no binding contract is even formed until the condition precedent to formation occurs, namely that Agusta issues a purchase order to Galileo, and Galileo consequently issues a purchase order to L–3OS. Defendant further argues that the "dual level of conditions precedent" required before a contract is formed means that the contract that is formed once those conditions are met is not embodied in the Sub–Supply Contract, but rather in the form of a Purchase Order.[19]

The question is thus whether the Sub–Supply Contract is unambiguous as to (1) its commitment to purchase any units from L–3OS and (2) if binding, whether the commitment to purchase is for all 60 units contemplated in the agreement, or rather only the amount in the ensuing purchase order. We find that the Sub–Supply Contract, by its unambiguous terms, covers the purchase of 60 units as contemplated in Article 4.1.[20] We make this finding based on the "commitment" language of that section, language throughout the document referring to the agreement as a contract, and the lack of any explicit language as to conditions precedent required prior to formation. *See* Gelb Aff. Exh. 37, Art. 4.1. We also note language citing the unit price for the

commissions were earned, as discussed above.

19. In making this argument, defendant characterizes the Sub–Supply Contract as a Basic Ordering Agreement ("BOA"), as defined in federal regulations regarding government contracting, rather than a contract. Regardless of whether such a regulation is applicable to the contract at issue, defendant's own expert, while describing the Sub–Supply Contract as a BOA, sets out characteristics of a BOA that are inconsistent with the terms of the Sub–Supply Contract in that the Sub–Supply Contract includes specific delivery dates and includes an obligation to purchase,

as opposed to BOAs, which require that buyers issue requests for quotation in advance of an order. Supplemental Certification of Anthony J. Marchetta ("Supp. Marchetta Cert.") Exh. H, 246–261; Plaintiff's Memorandum of Law in Opposition to Defendant's Cross–Motion for Summary Judgment ("Plaintiff's Opp. Mem."), 22–23.

20. Whether Galileo's possible decision not to order more than the twenty units already ordered would create an issue between Galileo and L–3OS is of no moment here as CIER has no right to a commission unless payments are made to L–3OS.

equipment, quoted as "fixed and firm," *Id.* at Art. 5.1, as well as the language in Article 5.3, *Id.* at Art. 5.3 ("in the case of failure of [Galileo] to fulfill the obligations set forth in Article 4.1 the Parties will negotiate in good faith a mutually agreeable price adjustment."), and Article 37's termination provision. Defendant argues that because the remedy provided is only renegotiation or termination, it is not demonstrative of a binding commitment. We do not find this argument persuasive.[21] The Sub–Supply Contract also sets out the methods to be used for payment to L–3OS, *Id.* at Art. 6 (providing for milestone payments and purchase orders), and provides that L–3OS undertakes to deliver strictly in accordance with the delivery dates in Annex K, *Id.* at Art. 7.

In sum, while we recognize that the amount of commissions due CIER will ultimately depend on future events which involve a chain of orders, that chain does not affect the reading of the Representative Agreement insofar as the obligations of L–3OS to CIER are concerned. Obviously, other issues may arise between the defendant and Galileo, but those are separate from the issues before this Court.

## IV. The Propriety of a Declaratory Judgment at this Time

■■■ Finally, defendant argues that a declaratory judgment is inappropriate at this time. Defendant argues that recent work stoppages at L–3OS and Galileo's failure to comply with the original order schedule in the Sub–Supply Contract suggest that any future performance under the Sub–Supply Contract cannot be predicted with any certainty. Because there is no coercive remedy under the Sub–Supply Contract to enforce Galileo's commitment, L–3OS argues, there is no contract to enforce, and thus no case or controversy. Defendant maintains that suit will not be ripe until compliance with the Sub–Supply Contract is achieved. Plaintiff counters that it is entitled to a declaratory judgment to clarify and settle the legal issue of contract interpretation and afford relief from the current uncertainty. Plaintiff argues that the court need not know what amount of commissions L–3OS will be obligated to pay CIER by the end of the relationship contemplated in the Sub–Supply Contract in order to award a declaratory judgment.

We agree with plaintiff in that we find this action ripe for consideration. We have been asked to interpret a valid contract that plaintiff argues continues to bind the parties regarding sales occurring during the contract's effective period.[22] *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 241, 57 S.Ct. 461, 81 L.Ed. 617 (1937)

---

**21.** Article 37 of the Sub–Supply Agreement sets forth extensive terms pursuant to which termination is allowed by the parties upon three months notice of one of the listed conditions of default by the Buyer and the failure of the Seller to "propose a remedy plan acceptable to the Buyer" within 60 days of receipt of the Buyer's notice. Gelb Aff. Exh. 37, Art. 37.1. The Agreement is also terminable on three months notice for the convenience of the parties if NAHEMA gives notice of termination on the Main Contract or in the case of extensive delay. *Id.* at Art. 37.2. Neither provision renders a contract unenforceable. *See* 2–6 Corbin on Contracts, ¶ 6.15 (Power to Cancel on Some Specified Non-performance of Duty by the Other Party), ¶ 6.10 (Promises Including an "Option to Terminate").

**22.** As contemplated by Article 5.3, the price terms and delivery schedule of the Sub–Supply Contract have in fact been renegotiated as a result of Galileo's failure to meet its "obligations" under the terms of the agreement. As discussed more fully above, the amended terms provide for a new schedule of deliveries under the first Purchase Order, now scheduled through 2011, but do not include any new purchase orders. *See* Gelb Aff. Exh. 56.

(finding that in a "concrete case admitting of an immediate and definitive determination of the legal rights of the parties in an adversary proceeding upon the facts alleged, the judicial function may be appropriately exercised although the adjudication of the rights of the litigants may not require the award of process or the payment of damages.") (citing *Nashville, C. & St. L. Ry. Co. v. Wallace*, 288 U.S. 249, 263, 53 S.Ct. 345, 77 L.Ed. 730 (1933); *Tutun v. United States*, 270 U.S. 568, 576, 577, 46 S.Ct. 425, 70 L.Ed. 738 (1926); *Fidelity Nat'l Bank v. Swope*, 274 U.S. 123, 132, 47 S.Ct. 511, 71 L.Ed. 959 (1927); *Old Colony Trust Co. v. Comm'r*, 279 U.S. 716, 725, 49 S.Ct. 499, 73 L.Ed. 918 (1929)). The fact that commissions owed may be dependent on future events does not change this result. *Associated Indem. Corp. v. Fairchild Industries, Inc.*, 961 F.2d 32, 35 (2d Cir.1992) (collecting cases). The parties' sealed submissions appear to indicate that defendant has received payments from Galileo for which CIER has not been paid commissions. If that is correct, we expect those unpaid commissions to be reflected in the proposed judgment discussed below.

## CONCLUSION

For the foregoing reasons, we grant plaintiff's motion for summary judgment on Counts I and II of the First Amended Complaint and declare that, pursuant to the 2002 Representative Agreement, L–3OS is obligated to pay CIER a commission equal to five percent of the Net Sales Price of all sonar equipment or component parts delivered pursuant to the Sub–Supply Contract, including any and all deliveries as contemplated in Article 4.1, upon L–3OS's receipt of payment for such delivery. To the extent that such payments have been or will be received from Galileo by L–3OS, L–3OS must notify CIER in a manner that allows CIER to submit an invoice

for its commissions. To the extent that L–3OS has not complied with its obligations under the 2002 Representative Agreement as set out above, it is in breach of that agreement. If the parties are unable to agree on the payments L–3OS has received to date and the consequent commissions due (as a mathematical matter), we would expect affidavit submissions to support the respective positions. The plaintiff is directed to submit a proposed judgment pursuant to this Order within five days on three days notice to the defendant.

**SO ORDERED.**